BEFORE THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAWN MOSS and | § | |
| KELLEY POWELL | § | |
| | § | |
| Plaintiffs | § | |
| v. | § | |
| | § | |
| DUFEK MASSIF HOSPITAL CORP., | § | |
| LTHM DALLAS-OPERATIONS, LLC, | § | |
| UGHS DALLAS HOSPITALS, INC., | § | CIVIL ACTION NO. _____ |
| UNIVERSITY GENERAL HOSPITAL, LP, | § | |
| UNIVERSITY GENERAL HOSPITAL | § | |
| SYSTEM, INC., UNIVERSITY | § | |
| GENERAL HOSPITAL SYSTEM, LLP, | § | |
| UNIVERSITY GENERAL HEALTH | § | |
| SYSTEMS SOUTHWEST, L.P. and | § | JURY DEMAND |
| UNIVERSITY GENERAL HEALTH | § | |
| SYSTEM, INC. | § | |
| | § | |
| Defendants | § | |

COMPLAINT

Plaintiffs Dawn Moss ("Moss") and Kelley Powell ("Powell") submit the following

Complaint against Defendants:

Parties

1.      Moss and Powell are individuals.

2.      All of the Defendants are corporations or limited partnerships. They may be

served through tone or more individuals, including Edward T. Laborde, 7501 Fannin Street,

Houston, Texas 77054, in the case of Defendants Dufek Massif Hospital Corp., UGHS Dallas

Hospitals, Inc., University General Hospital, LP., University General Health System, Inc.,

University General Hospital System, LLP, and University General Hospital Systems Southwest,

LP and  Christopher T. Owens, 6110 Farm to Market Road 1488, Magnolia, Texas 77354, in the

case of Defendant LTHM Dallas – Operations, LLC. In December 2012, one or more of such Defendants became Plaintiffs' employer as a result of its acquisition of the Hospital, as defined in paragraph 5.

## Jurisdiction

3.      This Court has jurisdiction over this suit under 28 U.S.C. §1331, as it asserts claims under 31 U.S.C. §3730(h).  This Court also has supplemental jurisdiction under 28 U.S. §1367 over Plaintiff's claim of wrongful termination under Texas law.

4.      Venue is proper under 28 U.S.C. §1391(b) and 31 U.S.C. §3732(a) because Defendant transacts business in this District and Division and the acts and omissions on which this action is based occurred in this District and Division.

## Facts

5.      On or about March 12, 2012, Moss began her employment as a quality manager at South Hampton Community Hospital location (the "Hospital") in Dallas, Texas at an annual salary of approximately $58,000. Moss' primary responsibility was to ensure compliance with all state and federal health laws and regulations in day-to-day activities of the Hospital.

6.      On or about August 13, 2012, Powell began her employment with the Hospital as the director of the Hospital's intensive care unit, wound care and emergency room under chief nursing officer Tanya Miller ("Miller").

7.      Shortly after Moss began working for the Hospital, Steve Walker ("Walker"), chief executive officer of the Hospital, raised Moss' salary to $65,000 based on her demonstrated superior performance, exceeding expectations. In December 2012, one or more of Defendants began to operate the Hospital by purchase of the stock or assets of Defendant Dufek Massif Hospital Corporation or otherwise.

COMPLAINT - Page 2

8.      After beginning employment at the Hospital, Moss and Powell observed a number of categories of illegal conduct at the Hospital, as described below in paragraphs 9 through 16.

9.      In September 2012, Powell observed that an individual, Larry Browning ("Browning"), was providing medicine and other treatment in connection with wound care without a license or certification. Powell further observed that Browning improperly had access to the Pyxis MedStation system for automated mediation disbursement. Also, after beginning employment at the Hospital, Powell further noticed that a medication cart in the wound care area of the Hospital was unlocked. Powell further observed that the records for the wound care unit were being kept in an unlocked cabinet. Consequently, medication and records were improperly accessible to third parties. Powell had the medication removed from the medication cart in the wound care area and took the medication cart out of service and had the records in that area moved to a secured area.  Upon becoming aware of the circumstances referred to above in paragraph 9, Powell also assured Browning's access to medication from the Pyxis system and medication cart was removed, and that Browning was no longer able to perform treatment except under supervision of a registered nurse. After Powell reported the circumstances referred to above in paragraph 9 to Miller, Miller immediately escorted Powell to meet with Walker and human resources/chief operations officer Linda Gould ("Gould"). Walker and Gould told Powell that she was worrying for no reason because nothing problematic ever happened in connection with the matters at issue. When Powell reported that she had secured the wound care area insofar as medication and records were concerned and removed Browning's access to the same, Walker told her that that was "really unnecessary."

10.     Within the first month of her employment, Moss performed a hospital-wide compliance, regulatory and billing audit and presented certain concerns to Walker, Gould and Miller related to up-coding and compliance and regulatory infractions.  Up-coding is practice of

changing the diagnosis code for a patient, extending a patient's hospital stay or carrying out more medical procedures than are warranted, in order to charge the patient and his or her insurance carrier, or other payor, including Medicare or Medicaid, a higher amount than proper, and thereby generate income to a hospital and treating physician not properly due. Both Moss and Powell observed this practice frequently at the Hospital, including both before and after a patient had been discharged and on days when such patient was not even in the hospital. Moss first reported up-coding in early April 2012 to the director of health information management Hugo Garcia ("Garcia").  Moss identified a Dr. Loc Trieu ("Trieu") as one of the physicians who regularly up-coded numerous patient charts, including those of individuals not his patients, in order to fraudulently increase medical charges. Garcia acknowledged that up-coding was illegal and could be Medicare fraud if Medicare was the responsible payor.  Garcia also informed Moss that the up-coding by Trieu had been directed by Walker. When Moss later reported the up-coding by Trieu to Walker in front of Gould, Walker instructed Moss to "mind her own f…….business." When Powell reported up-coding of medical surgical stays to intensive care unit stays, including for outpatient treatment, he told Powell much the same thing. Based upon patient charts that Moss reviewed, Moss determined that approximately 402 patients, including but not limited to those of Trieu, were improperly up-coded between March 29, 2012 and June 18, 2012. Based on a preliminary audit, the amount of charges generated from the practice of up-coding for certain of such patients was $391,500 for this period alone.  This amount is subject to revision since the audit from which Moss obtained this information had not yet been completed at the time such information was disclosed.  The primary payor affected by up-coding was Medicare, which was charged approximately $8 million by the Hospital in 2012.

11.     Moss and Powell both observed and reported to Walker, Gould, Miller and Trieu that nurses and doctors were texting messages regarding admitted patients, and photographs of

such patients, on their private phones so that they could fill out information on the patient chart remotely and without actually seeing the patient. Because the phones through which the texts and photographs were sent were not encrypted, the information on these phones was accessible by unauthorized third parties such as telephone companies and family members.  This represented unauthorized disclosure of confidential patient information to third parties in violation of the Health Insurance Portability and Accountability Act ("HIPAA"). Also representing a violation of HIPAA, and otherwise improper, was Trieu's up-coding of charges to individuals not his patients.

12.     During 2012, Moss also observed that large quantities of prescription drugs at the Hospital were neither locked down nor secured and therefore were not protected from theft and unauthorized access and indeed, that large quantities of prescription medications, having a value of as much as $200,000 or more per month, had been disappearing from the Hospital without any record or accounting.  Under §291 of the Texas Administrative Code, the theft or significant loss of any controlled substance is required to be immediately reported to the Texas State Board of Pharmacy.  A similar report is supposed to be made to the Drug Enforcement Agency ("DEA") on a DEA Form 106.  Moss estimates that, in 2012, over $1 million worth of medication drugs were unaccounted for. Although security surrounding the pharmacy was improved after a third party was retained to manage the Hospital's pharmacy in August 2012, Moss observed and reported that the Hospital still failed to send pharmacy inventory reports to the DEA, Department of Public Safety or Texas State Board of Pharmacy. Powell and Moss complained to Tina Doan ("Doan"), the Hospital's pharmacy director in December, 2012, and Doan claimed she had provided information to make such reports to Walker.

13.     Under Medicare regulations, doctors are required to visit admitted patients of the Hospital a minimum of once every 24 hours during their hospital stay. Moss and Powell

observed many doctors billing patients for hospital visits that were never made. The charts demonstrating this practice were not properly signed, authenticated or reviewed with a complete signature, credentials, date and time. Moss reported this to Walker, and to the chief executive officer who replaced Walker in March 2013, Susie Edler ("Edler"), but no responsive action was taken.  Moss continued to report this practice in multiple meetings with Edler and other members of management who acknowledged that such practices constituted Medicare fraud.   Moss believes that the dollar volume charged to insurance carriers and Medicare for patient visits that never occurred as required is in the hundreds of thousands of dollars.

14.     The Hospital received a demand letter from Medicare for reimbursement of approximately for $4 million for double-billing which occurred in 2011. Double-billing is when a hospital submits a bill for payment more than once for the same procedure.  When a doctor does not visit the patient in hospital, and instead treats the patient via phone or text, not only does the hospital bill for the stay, so does the doctor. Consequently, the payor is double-billed. When Medicare notices a discrepancy, a demand letter goes out to the facility for payment.  Doctors charged separately for their office visits separate from hospital visits. Medicare would normally challenge the practice of double billing. However, unless a patient chart is audited, Medicare would not know of such fraud.

15.     Moss and Powell also observed a practice wherein Walker would ask Dr. Trieu to "put butts in the beds." Trieu would order the transfer of patients from hospices and elderly care centers located in Plano and Richardson, Texas to the Hospital, so that the Hospital could charge for a hospital stay.  Plaintiffs believe that this was done in order to ensure maximum occupancy for which the Hospital could then charge the patient's insurance carrier, or other payor, which in most cases was Medicare. Frequently, the patients had no valid reason to be in the Hospital. Many patients and their families were upset because they had no idea why the patients were in

the Hospital, and had scheduled appointments with the Veteran's Administration or other providers which they ended up missing. Powell also observed multiple instances where doctors would direct a patient to the emergency room for a follow up visit that was completely unnecessary but for which the Hospital could charge a higher rate for the services rendered in the emergency room as compared to an office visit. One frequent example of this was when surgeons would redirect their post-operative patients through the emergency room for their post-operative visits. This is fraudulent because all post-operative visits are normally included in the surgery charge. The patient would as a result be charged improper and unnecessary emergency room charges.

16.     Moss discovered in 2012 that a trailer provided to the Hospital by the Federal Emergency Management Administration had not been used for its intended purpose, and supplies intended to be stored in the trailer removed to the Hospital without compensation, and emergency drills necessary to maintain the trailer never performed.

17.     On or about March 4, 2013, Moss spoke to representatives of the Texas Medical Foundation ("TMF") about some or all of the matters referred to in paragraphs 9 through 16. Moss was directed to report her findings to the Office of Inspector General ("OIG") of the Federal Department of Health and Human Services, which Medicare identifies as the appropriate contact on its website for purposes of reporting fraud. On February 4, 2013, Moss spoke to a representative of the OIG and sent a full report of her findings covering the matters referred to in paragraphs 9 through 16. Moss later received a return call from a representative of TMF in March 2013, who told her that an investigation had begun.

18.     On or about June 28, 2013, Moss was contacted by auditors performing a "due diligence" exercise for the Hospital's insurance carrier, CNA, following acquisition of the Hospital as described in paragraph 7. Gould's successor chief operating officer, Harmonee Vice

("Vice"), instructed Moss to fully cooperate with the auditors.  Moss promptly met with Wes Sternenberg (**"Sternenberg"),** a certified public accountant and partner with the firm of Draffin & Tucker, a healthcare auditing firm. Sternenberg explained to Moss that his job was to assess the risk involved with coverage to the facility and also stated that he was experienced in medical auditing. Sternenberg explained to Moss that the reason for this audit was because one or more Defendants had failed to conduct a proper "due diligence" investigation prior to acquisition of the Hospital as described in paragraph 7.  Sternenberg directly asked Moss if she was aware of any Medicare fraud at one or more of the Defendants. Moss identified some or all of the up-coding and other illegal practices referred to in paragraphs 9 through 16. Moss volunteered that she was shocked at what she had observed since working at one or more of Defendants. Moss further explained how patient information and diagnoses were brought to weekly meetings and how Trieu would decide whether to use a higher code in order to charge more to the patient and ultimately the insurance carrier, or other payor, including Medicare. Moss further explained how she reported this to Walker, who then told her to mind her "own fucking business."

19.     Also after December 2012, Powell spoke with vice-president of marketing of one or more of Defendants, Richard Valentine, and Vice, on at least five different occasions and reported some or all of the concerns referred in paragraphs 9 through 16.     Moss and Powell were told by Walker, "Do not speak with anyone from UGH unless Linda [Gould], Tanya [Miller] or myself are present.  Anyone that does is fucking fired."  Several times over the course of December 2012, both Moss and Powell were told that that they could not have lunch together and could not visit each other in their respective office.

20.     In January 2013, Walker was overheard by Moss telling Miller and Gould to come in to the office with him because, "I am going to show you how to neuter someone." Thereafter, Powell was demoted from emergency room and intensive care unit director to

nursing manager.  Powell was told that she was no longer welcome in the morning meetings. On February 1, 2013, Powell was called and asked to report to Miller's office.  Powell passed Walker in the hallway leaning against the wall, who was smiling at Powell.   When Powell entered Miller's office, Gould was sitting there.  Powell sat down and Miller told her that they had decided to make a change and decided to eliminate Powell's position.  When Powell stood up and walked out, she was escorted out of the Hospital.

21.     Before and after February 2013, Moss continued to report her concerns of illegal activities to Vice, Valentine and Edler.

22.     On or about March 25, 2013, Edler became the new chief executive officer at the Hospital. Moss gave Edler a full report of the her concerns over some or all of illegal activities referred to in paragraphs 9 through 16 as well as in a writing dated March 29, 2013 per Edler's request. Nothing was done. Edler's only response was "Oh well, that's on Steve Walker."

23.     In April 2013, Vice summoned Moss to the Hospital board room. Vice informed Moss that the only reason she was still employed with one or more of Defendants was that she stopped talking, while Powell didn't know when to stop, so she had to be terminated.

24.     On various date in June, July and August of 2013, Moss had private meetings with Cristy Schade, the Hospital's chief medical officer regarding hospital up-coding and other illegal conduct referred to in paragraphs 9 through 16. Moss was advised by Dr. Schade to obtain legal counsel.

25.     On or about July 11, 2013, Moss spoke to Kris Trent ("Trent"), chief accounting officer of one or more of  Defendants, who told Moss that she was worried about her because she and Sternenberg had presented Moss' audit findings anonymously to in-house counsel of one or more of Defendants, Edward LaBorde, its chief financial officer, Michael Griffin and to Vice, who responded, "I know who told you this. It was Dawn Moss, she complained to me of this

back in January." Trent and Sternenberg, told Moss they understood that Walker and Vice had known about the up-coding concerns months earlier, but had taken no action to remedy or report the same to the corporate office. Griffin then called Walker and put him on speaker phone. Griffin asked Walker if he was aware of the up-coding. Walker denied any knowledge.

26.     On or about July 12, 2013, Trent travelled from corporate offices of one or more of Defendants in Houston, Texas to meet with Moss, who shared everything with Trent that she had previously reported to Sternenberg. Trent took documents evidencing some of the up-coding back to the corporate office with her. Edler then directed Moss to meet weekly with her to discuss compliance issues within the Hospital. Despite repeated attempts, however, Moss never met with Edler because Edler would either put her off or promise to re-schedule the weekly meetings.

27.     In mid-September 2013, Edler gave Moss a negative performance review and told Moss that she had 30 days in which to improve her performance or she would be terminated. During this 30-day action plan, Moss was supposed to meet with Edler each week to discuss her progress, but Edler continued to avoid these meetings. Moss was never allowed to complete the 30-day action plan and was summarily terminated on October 3, 2013 on the pretextual ground, purportedly unrelated to her concerns referred to in paragraphs 9 through 16, that she had injured the relationship between the Hospital and its emergency room staffing provider. Edler also informed Moss at the time of her termination, "I don't know how you did it, but you know way too much."

<u>Claims</u>

28.     For their first cause of action, Plaintiffs would show that one or more of Defendants has violated 31 U.S.C. §3730(h), in that Plaintiffs were threatened, harassed,

<u>COMPLAINT</u> - Page 10

discharged and otherwise discriminated against in the terms and conditions of employment because of lawful acts of Plaintiffs in furtherance of efforts to stop violations of 31 U.S.C. §3729.  Plaintiffs are accordingly entitled to be reinstated to employment with one or more of Defendants and to recover from one or more of Defendants two times the amount of  their back pay, interest on the back pay, front pay, and compensation for any special damages, attorney's fees, prejudgment interest, and costs of court.

29.     Plaintiffs demand a jury.

WHEREFORE, Moss and Powell pray for all relief to which they are entitled.

Respectfully submitted,

/s/ Robert E. Goodman, Jr.
Robert E. Goodman, Jr.
TSB No. 08158100
reg@kilgorelaw.com
Kilgore and Kilgore
3109 Carlisle Street
Dallas, Texas 75204
(214) 379-0827 Telephone
(214) 953-0133 Facsimile

COUNSEL FOR PLAINTIFFS